UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
------------------------------------------------------------------X
JAY WILFONG,

          Plaintiff,

    -against-

STARSTRUCK ENTERTAINMENT, LLC,
THE ALEXANDER TRUST,

23-CV-____

         Defendants.

------------------------------------------------------------------X

COMPLAINT TO APPEAL DECISION OF UNITED STATES PATENT AND TRADEMARK OFFICE, TRADEMARK TRIAL AND APPEAL BOARD

03-23 0044

Plaintiff, acting Pro Se while obtaining future counsel, respectfully sets forth and alleges:

### I.
### JURISDICTION AND VENUE

1. This action under Lanham Act Section 21, 15 U.S.C. 1071(b). This Court has jurisdiction under 28 U.S.C. 1331 and 1338.

2. Venue is vested in this Court pursuant to 28 USCS 1391 and 1400 in that the claims asserted here arose within this district, and that Plaintiff's principal place of business and domicile are located within this district.

### II.
### THE PARTIES

3. At all relevant times, Plaintiff Jay Wilfong ("Wilfong") is and was an individual domiciled in the State of Tennessee. Plaintiff's address is 2890 Academy Road, Lebanon, Tennessee 37087.

1 | Page

4. At all relevant times, Defendant STARSTRUCK ENTERTAINMENT, LLC. is and was a limited liability company organized and existing under the laws of the State of Tennessee. Defendant's business address is 40 Music Square West, Nashville, Tennessee 37203-3206.

5. At all relevant times, Defendant THE ALEXANDER TRUST is and was a trust organized and existing under the laws of the State of Tennessee. Defendant's business address is 40 Music Square West, Nashville, Tennessee 37203-3206.

## III.
## CLAIM FOR RELIEF (APPEAL FROM TTAB DECISION)

6. By this action, Wilfong appeals the ruling of the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("PTO") in Proceeding Number 92073879 dated November 16, 2022. This appeal to this Court is authorized by 15 U.S.C. 1071(b) and 37 C.F.R. 2.145(c), which provide that a Registrant of a trademark who is dissatisfied with a decision of the TTAB has a "remedy by a civil action." TTAB Proceeding Number 92073879 was a Cancelation Proceeding regarding Trademark Registration Number 6020394 for the mark "STARSTRUCK FARM," issued to Jay Wilfong on March 24, 2020 as a result of Jay Wilfong's filing of Trademark Application Serial Number 88400734 on April 24, 2019.

## FACTUAL BACKGROUND

7. Wilfong purchased a farm known as STARSTRUCK FARM in the Spring of 2019. The prior owners of the farm that he purchased did not request any restrictive covenant relative to the use of the name STARSTRUCK FARM or STARSTRUCK FARMS in any of the real estate transfer papers. There is no prohibition or covenant in the warranty deed that disallows or even

discourages usage of such name.

8. To the contrary, the prior owners in fact left the name, literally cut in stone, on the front entrance gates of the farm. Every indication was that the original and prior owners were actually giving Wilfong their blessing to use the name and in fact actually marketed the property for sale as "Starstruck Farms".

9. The two stone monument gate structures at each side of the entrance to the farm were fully intact and in good condition when Wilfong purchased the farm in 2019 and their presence was a key factor in Wilfong's decision to purchase the property known as Starstruck Farms.

10. If there were to be any viable argument against the use of the name STARSTRUCK FARM, Defendant should have directed it to the purchasers of the farm prior to Wilfong and should have done so many years ago. It was Blackstock and subsequent owners who maintained the farm's stone monument entry signage, at all times prior to being transferred to Wilfong with zero restrictions. The farm has been known historically for almost 25 years as Starstruck Farms and the long-standing use of the name is irrefutable.

11. Defendant The Alexander Trust, *an alter ego of individual Narvel Blackstock,* is the assignee of a Registration that was asserted by the present Defendants, who were collectively the Petitioner in the TTAB Proceeding. The public record illustrates that Blackstock was never an owner or even co-owner of the farm that Wilfong purchased, or of the trademark STARSTRUCK FARM. Instead, it appears that Blackstock is seeking to ride on the coattails of his ex-wife, Reba McEntire, who once owned the farm.

12. The warranty deed and related property records / transfer documents indicate that Reba McEntire had owned the farm solely, not Blackstock. Therefore, it is improper for Blackstock to assert any rights to the mark STARSTRUCK FARM based on his former marriage.

3 | P a g e

Case 3:23-cv-00044   Document 1   Filed 01/18/23   Page 3 of 20 PageID #: 3

13. Reba McEntire was not a party to the TTAB Proceeding, and there is no indication that Reba McEntire has any issue with Wilfong's usage of the name STARSTRUCK FARM. Despite operating his business for years, Wilfong never received any request from Reba McEntire or anyone on her behalf regarding the name.

14. Wilfong is allowed to discuss the history of the property in his advertising, as many other properties do. Wilfong is allowed to continue to refer to his farm as Starstruck Farm and allowed to operate business ventures at Starstruck Farm. This is no way implies that Wilfong is affiliated with Reba McEntire or any company she ever was a part of. To the contrary, any reference Wilfong ever made to Reba McEntire actually confirmed that she was just a prior owner that Wilfong is not affiliated with.

15. Local residents tend to be familiar with the property itself and its history. Given the fact that Wilfong converted it from a horse breeding farm to a lodging and wedding business, local residents know full well that Wilfong is not affiliated with Reba McEntire.

16. Further regarding the history of the property, the Defendants have stated that the farm had been used only for horse breeding and training horses. The Defendants therefore admitted that the farm itself had nothing to do with music when it was owned by Reba McEntire.

17. Even after Wilfong was contacted by a representative of the Defendants, and even after Wilfong informed such representative that Wilfong had filed for trademark protection for the name STARSTRUCK FARM, there was no immediate legal action taken by Defendants or anyone on Defendants' behalf. This gave Wilfong the distinct impression that he was free to continue using the name.

18. As for his business, Wilfong has various types of lodging and dining options on his property, including small units in a converted horse stable, as well as "A-Frame Glampers." They

all provide a recreational experience. They are all offered on Airbnb.

19. Wilfong also has various activities on the property for his guests such as hayrides, bonfires, and barbecues.

20. Wilfong also has open stage mic music nights, such as country and blues jams. These are informal events where about 6 to 12 local musicians participate in an open stage jam, playing together in different combinations, depending on who is present.

21. In addition, the Mending Fences Cowboy Church has a small church service on Wilfong's property on a weekly basis with a small following. Some music is occasionally played during their services, as with any other church services, but no one would ever think that Wilfong's business was affiliated with the Defendants' music business because of this.

22. Wilfong also has weddings on the property due to its beautiful scenery and accommodations. Once again, if any music is involved in such weddings, it would not cause anyone to think that Wilfong's business was affiliated with the Defendants.

23. Anyone seeking to book lodging at Wilfong's farm would not be making an "impulse" purchase wherein they would assume that the services are being offered by the Defendants. In researching where they would be staying, the available amenities, the local area, and the cost and terms for the stay, prospective customers would know full well that they were not dealing with Reba McEntire, or a record company, or a recording studio, or a talent agency.

24. To the present, after thousands of people have visited his farm, Wilfong has never had a single person make any comment about any link or connection to "STARSTRUCK ENTERTAINMENT." Still, to this day, there has been no actual confusion in the marketplace whatsoever.

25. STARSTRUCK FARM is a farm, a wedding venue, a short-term lodging B & B

establishment, a camping site, a site for hiking and sight-seeing, and has food and catering services. Defendants' business does not offer any of these services or activities, and very likely never will.

26. Defendant itself says that its primary role is as an "artist manager." Wilfong does not offer such services or anything of the sort – he simply operates a bed and breakfast style, campground property located on a property historically known as Starstruck Farm.

27. Wilfong's business and Defendants' record company / artist management service has never, and will never, be confused with each other because the services are so different, because the target market is so different, because the consumers are knowledgeable, and because the respective advertising and logos are different. Wilfong even changed the logo that is located at the farm shortly after he purchased the property.

28. In sum, Wilfong purchased the farm as "STARSTRUCK FARM" in good faith, paid the agreed-upon price, and fully expected to have rights in and to the name. There was no reason to think anything to the contrary.

29. Wilfong now demands the benefits of the bargain that he made and the considerable price that he paid. Wilfong is not seeking a "free ride" of any sort. Had anyone proven that the mark was owned by any other party, Wilfong would have offered less money in the transaction, as he would have been receiving less value.

30. The subject farm, located at 10471 TN-109, is known in middle Tennessee, and specifically Wilson County, as STARSTRUCK FARM. It is not possible to undo this knowledge. To rename the venue would actually cause confusion to the public, which is unwarranted and unnecessary, and is exactly what the trademark system seeks to prevent.

31. A change of the name would also come at an out-of-pocket cost, and would unfairly cause considerable loss of value of Wilfong's investment in the property.

32. Defendants' unjustified interference with Wilfong's business at STARSTRUCK FARM has already been highly detrimental to the promotion and advancement of his business, and has already forced Wilfong to incur significant fees and expenses.

33. A name change, or even a sudden lack of Registration, would unjustly damage Wilfong's growing business ventures conducted at STARSTRUCK FARM. It is simply unfair to strip Wilfong of his rightfully-obtained Trademark Registration.

## DEFENDANTS HAD NO STANDING TO MAKE A CLAIM TO THE MARK

### Defendants Never Protected The Mark At Issue

34. At no time prior to Wilfong's purchase of the farm named STARSTRUCK FARM in the Spring of 2019 did Defendants make any effort to protect the name STARSTRUCK FARM or STARSTRUCK FARMS in any way. Defendants simply failed to seek trademark protection for same. This is consistent with Defendants having no claim to such mark and no rights to such mark. Clearly, Defendants were never concerned that the public would confuse the farm with their entertainment company, for which they attained a Registration is Class 009. If such *was* a concern, Defendants would have attempted to protect the mark as a farm or venue many years ago.

35. Likewise, Defendants failed to create any social media accounts, websites, web pages, or any domain names relative to STARSTRUCK FARM, proving their general lack of interest in such name.

36. Defendants have argued that they have *"common law rights in STARSTRUCK for use with musical events booking services, talent management, and other services."* This is an admission that Defendants failed to seek protection for anything beyond "pre-recorded CDs and downloadable digital files featuring music" – the specific goods covered by their Trademark

7 | Page

Case 3:23-cv-00044   Document 1   Filed 01/18/23   Page 7 of 20 PageID #: 7

Registration.

37. Defendants have asserted that "While married, Blackstock and McEntire owned STARSTRUCK FARMS, which they operated as part of the family of STARSTRUCK businesses." This is untrue, and is an example of Defendants conveniently merging the farm into the unrelated record business in an attempt to claim some sort of trademark rights *retroactively*. The farm was a private <u>horse farm</u> when owned by McEntire - it was <u>not</u> used in conjunction with the recording company or talent management company. It is equally irrelevant that Defendants have allegedly used the term "STARSTRUCK" in connection with an auto racing team. STARSTRUCK FARM was never a part of a family of marks. It was the name of the <u>horse farm</u>, which Wilfong legally and legitimately acquired.

**<u>Defendants Never Sought To Restrict Usage Of The Mark</u>**

38. The prior owners of the farm that Wilfong purchased failed to request any restrictive covenant relative to the use of the name STARSTRUCK FARM or STARSTRUCK FARMS in any of the real estate transfer papers. There is no prohibition or covenant in the warranty deed that disallows, or even *discourages*, usage of such name.

39. To the contrary, the prior owners in fact left the name, *literally cut in stone*, on the front entrance gates of the farm. The prior owners clearly either intended for the successor to use such name, or otherwise did not care one way or the other. In fact, the name may have even been intentionally left on the monuments to entice prospective purchasers. The two stone monument gate structures at each side of the entrance to the farm were fully intact and in good condition when Wilfong purchased the farm in 2019.

40. Apparently, Defendants did not feel the name STARSTRUCK FARMS was causing

any form of confusion, otherwise they would have filed legal proceedings to remove the name from the monuments years before Wilfong purchased the farm.

41. Defendants' claims are misguided and improper because Wilfong is not the proper party to whom any complaint should be made. If there were to be any viable argument against the use of the name STARSTRUCK FARM, Defendants should have directed it to the prior owners of the farm years ago, but neglected to do so and must now pay the consequences of this. It was such prior owners who maintained the farm's stone monument entry signage, which they then transferred to Wilfong.

**Blackstock Never Owned The Farm**

42. Co-Petitioner The Alexander Trust, an alter ego of Narvel Blackstock, is the assignee of the Registration asserted by Defendants in the TTAB Proceeding. Importantly, the public record illustrates that Blackstock was never an owner or even co-owner of the farm that was purchased by Wilfong, or of the trademark STARSTRUCK FARM. In fact, it appears that Blackstock is seeking to ride on the coattails of his ex-wife, Reba McEntire, who once owned the farm.

43. The warranty deed and related property records / transfer documents indicate that Reba McEntire had owned the farm solely, not Blackstock. It is simply improper for Blackstock to assert any rights to the mark STARSTRUCK FARM based on his former marriage.

44. Reba McEntire was not a party to the TTAB Proceeding, and there is no indication that Reba McEntire has any issue at all with Wilfong's continued usage of the name STARSTRUCK FARM.

## Defendants Unfairly Delayed To Assert Claims Against Wilfong

45. Even after Wilfong was contacted by a representative of the Defendants, and even after Wilfong informed such representative that he had filed for trademark protection for the name STARSTRUCK FARM, there was no immediate legal action taken by Defendants or anyone on Defendants' behalf.

46. Defendants neglected to file an Opposition to Wilfong's mark when his trademark application was published for opposition – the mechanism created by the USPTO precisely for parties such as the present Defendants to have their claims heard before the applicant invests significant funds into the mark and its related business. As such, this is a classic case of acquiescence, if not laches.

## Defendants Failed To Assert Claims Against Third Parties

47. Defendants have claimed to have national, and even world-wide business operations under the name "STARSTRUCK ENTERTAINMENT." However, Defendants have taken <u>no</u> action against dozens of other businesses that are using the term "STARSTRUCK" including "STARSTRUCK FARMS" of Towson, Maryland. (www.starstruckfarms.com) "Starstruck" is a common dictionary term, one that has been used for many different business ventures by many different parties. No fewer than six other STARSTRUCK Registrations were active at the time of the TTAB Proceeding. Defendants summarily dismissed all of such Registrations as "irrelevant." However, this is not the case – the presence of the other Registrations illustrates that Defendants' rights to its mark are inherently limited. There is no other way to interpret all of the marks co-existing with one another, especially those that are for highly-relevant goods or services.

48. For the purposes of example, Registration Number 5,601,599 is for the mark

"STARSTRUCK DANCE CHALLENGE." The Registration is in Class 041 – just like Wilfong's Registration – and is used in connection with "Entertainment in the nature of competitions in the field of dance; Organization of dancing events." Per Registration 5,601,599, such mark has been in use since February, 2015. Importantly, "DANCE CHALLENGE" was disclaimed by that registrant.

49. It is illogical and improper for Defendants to attack *Wilfong's* Registration, but do nothing about the "STARSTRUCK DANCE CHALLENGE" Registration. The two are in the same class, and use the same operative first word <u>for entertainment services</u>. Dance necessarily involves music, yet Defendants have no problem with *that* Registration. The Trademark Examiner for Wilfong's trademark application was correct – there is no likelihood of confusion between Defendants and Wilfong.

## EVEN IF DEFENDANTS HAD STANDING, THERE IS NO LIKELIHOOD OF CONFUSION

50. There is also no likelihood of confusion between the marks at issue. Wilfong's Registration No. 6,020,394 for STARSTRUCK FARM is in International Class 041 for "Providing facilities for recreation activities." To the contrary, Defendants' asserted Registration No. 3,611,718 for STARSTRUCK is in International Class 009 for "pre-recorded CDs and downloadable digital files featuring music." In making its claim, then, Defendants are essentially seeking complete control over the word "starstruck" in *any form* and applied to *any product or service*. Defendants are simply not entitled to such expansive rights.

### The Marks Themselves Are Sufficiently Different

51. Defendants have described Wilfong's addition of "FARM" to the term "STARSTRUCK" as insignificant. This is disingenuous. The presence of the term "FARM" in Wilfong's mark more than sufficiently distinguishes Wilfong's mark from any mark used by Defendants. It serves to create a different visual appearance, a different sound, and indeed a different meaning than any mark used by Defendants.

52. Importantly, the connotation of Wilfong's mark is entirely different, as no rational consumer would see or hear the term "FARM" and think of a *record label or a talent agency*. Such would make no sense. As such, it is completely incorrect for Defendants to characterize the marks as "*extremely similar*." Moreover, whereas the term "FARM" may be descriptive in one context, it is of great significance because farms and record labels typically have nothing to do with each other whatsoever. From the start, anyone exposed to both marks would not assume any affiliation between the entities.

**The Respective Services Are Sufficiently Different**

53. The consumer's initial impression that the entities are separate would then be bolstered by the differences in each entity's services. To the extent that Wilfong has any music on his "B&B" type campgrounds, it mostly consists of "jam nights" or "open mic nights" by local musicians. This is in stark contrast to Defendants' promotion of famous country musicians that play large arenas and stadiums and conduct world tours.

54. No reasonable person would think that a rural B&B-style lodging grounds would be affiliated with Defendants, with or without music being played on such farm for such a small audience and at such a low cost. Furthermore, Defendants to date of filing have not produced one account of damage or confusion caused by Wilfong's mentions of the farm name, Starstruck Farm.

55. Though Defendants have argued that Wilfong's services *"overlap"* with those of Defendants, such is simply untrue. Wilfong does not manage performers in any way, shape, or form. He is not a talent agency, is not an agent, is not a representative of musicians, and certainly is not a record label or recording company.

56. Defendants have also argued that they are engaged in some sort of "songwriting" services. This uncorroborated assertion is by made the Defendants in an effort to *force* an overlap with Wilfong on the grounds that Wilfong has had songwriters appear at his property. This alleged service by Defendants (which is far afield of their listed goods and services) is of no consequence here because Wilfong does not manage the careers of songwriters.

57. All of the above distinctions are particularly strong when coupled with the fact that the companies' respective services are entirely dissimilar. It strains credibility to imagine that a rural farm could be confused with a musical management agency and recording studio located on Music Row in the city of Nashville, Tennessee. It is incorrect for Defendants to argue that the respective services are "highly related," and this factor of the likelihood of confusion analysis clearly tips in Wilfong's favor. Again, to be emphasized: *<u>Defendants to date of filing have not produced one account of damage or confusion caused by Wilfong's mentions of the farm name, Starstruck Farm.</u>*

**<u>The Relevant Consumers Would Be Informed And Sophisticated</u>**

58. Defendants have attempted to write off the sophistication prong of the likelihood of confusion analysis as "neutral." This makes no sense. Anyone seeking to book lodging at Wilfong's farm would not be making an "impulse" purchase wherein they would be in such a hurry that they would assume that the services are being offered by the Defendants.

59. To the contrary, Wilfong's customers would be booking their stays in advance, and evaluating how Wilfong's property compares to competing properties. In researching where they would be staying, the available amenities, the local geographic area, the cost, the payment methods, the cancelation/modification policies, and the other terms and conditions of the lodging units, prospective customers would *of course* know full well that they were not dealing with Reba McEntire, or a recording studio, or a talent agency. Therefore, this factor weighs heavily in Wilfong's favor and all but renders likelihood of confusion impossible.

**The Trade Channels Differ Significantly**

60. Defendants have argued that the parties use similar trade channels to promote their respective services. Defendants attempted to support this argument by stating that both businesses use social media. This is of no value because <u>all</u> businesses use social media. Furthermore, Defendants have argued that they, like Wilfong, have used flyers and posters. This, again, is disingenuous. Wilfong has a rural farm, and of course uses flyers to promote his open mic nights and other small events. Defendants have a large corporation located in the city of Nashville with the resources to advertise its record label to the masses, which Wilfong is unable to do. As such, this factor weighs in Wilfong's favor, again showing that there is no likelihood of confusion between the businesses.

**Fame Of The Mark**

61. Defendants have argued that the "STARSTRUCK" name is famous. However, Defendants fail to argue, because they cannot, that the mark "STARSTRUCK *FARM*" is famous. Here, Defendants again refused to acknowledge the inherent huge difference between farms and

record companies in any consumer's mind.

62. To the extent that Defendants established that the term "STARSTRUCK" is well-known, such actually supports *Wilfong's* argument. This is because Defendants confirmed that the term may be associated with a *record label* – not with a bed and breakfast that advertises on Airbnb. Therefore, this factor actually does nothing to advance Defendants' likelihood of confusion claim.

**Similar Marks Exist**

63. There are six unrelated registrations using the term "STARSTRUCK" in the USPTO registration system. This tends to show that the Defendants' mark is entitled to a small and tight zone of protection, not an expansive one.

64. Registration Number 5,601,599 is for the mark "STARSTRUCK DANCE CHALLENGE," but this was ignored by Defendants. Such Registration is in Class 041 and is used in connection with "Entertainment in the nature of competitions in the field of dance; Organization of dancing events." Per Registration 5,601,599, such mark has been in use since February, 2015. It is illogical and improper for Defendants to attack *Wilfong's* Registration, but do nothing about the "STARSTRUCK DANCE CHALLENGE" Registration. The two are in the same class, and use the same operative first word for entertainment services. Dance necessarily involves music, yet Defendants have no problem with *that* Registration.

65. Because similar marks exist in the same field, Defendants should not be able to attack Wilfong's Registration. The presence of the term "FARM" in *only* Wilfong's mark differentiates Wilfong's mark from all of the others – including the Defendants. Given the prevalence of the term "STARSTRUCK," this factor weighs in Wilfong's favor and supports a finding of no

likelihood of confusion.

**Defendants Do Not Use The Mark On A Wide Variety Of Goods**

66. Defendants argued that their mark is used on a "wide variety of goods." This is inaccurate, as their mark is used on a tight group of items that center around its record label. The mark actually appears on necessary and expected items only, such as records themselves and advertisements.

67. Though the mark has apparently been used to sponsor an auto racing team, such is of no consequence, and such is not indicative of any relevant expansion of the goods and services for Defendants.

68. Defendants do <u>not</u> use the mark for a farm, do <u>not</u> use the mark for short-term lodging, and do <u>not</u> use the mark for a location for weddings, barbecues, or small private affairs. As such, this factor weighs in Wilfong's favor.

**There Has Been No Actual Confusion**

69. To the present, after thousands of people have visited his farm, Wilfong has never had a single person make any comment about any link or connection to "STARSTRUCK ENTERTAINMENT." Likewise, Defendants admitted that they had <u>no</u> evidence of actual confusion either. This fact is not to be taken lightly, as it strongly infers that there is no likelihood of confusion.

70. Defendants asserted that Wilfong "had not had a significant opportunity to penetrate the market with his mark." However, it must be noted that Defendants made this argument using old, outdated information, specifically, a comment made by Wilfong in December, 2020.

71. Wilfong has now used his mark <u>for over three years</u> with no actual confusion detected

by either party. Such is more than enough time for actual confusion to arise if there was ever going to be any. The respective businesses are simply to disparate and distinct for confusion to be likely. Again, Defendants' STARSTRUCK ENTERTAINMENT is <u>not</u> a farm, <u>not</u> a wedding venue, <u>not</u> a short-term lodging B & B establishment, does <u>not</u> have camping, does <u>not</u> have hiking and sight-seeing, does <u>not</u> have catering services, and does not have any other activity that could possibly be confused with Wilfong's business. Thus, this factor weighs in Wilfong's favor.

**<u>Wilfong Acted In Good Faith</u>**

72. It is inaccurate for Defendants to characterize Wilfong as having a "bad faith adoption" of his mark. Wilfong literally purchased a farm with the name in question – a farm where the prior owners literally left large stone monuments at the entrance that displayed such name. Wilfong did not know the ownership details of the Defendants' record label or talent management company, nor should he have. This is the opposite of bad faith on Wilfong's part – it is simply a new owner keeping the name that he purchased fair and square, with the prior owners' blessing.

73. As admitted by Defendants, Reba McEntire is no longer even affiliated with Starstruck Entertainment. If customers like the fact that the property was once owned by Reba McEntire, this actually has nothing to do with the term "STARSTRUCK." In other words, such customers would be intrigued by the history of the property regardless of the farm's past, present, or future name. The interest would be regarding *Reba McEntire herself*, not the name at issue in this case.

74. Defendants think that Wilfong's reference to Reba McEntire helps its case, but it actually helps *Wilfong's* case instead. This is because Wilfong's reference to Reba McEntire, in and of itself, makes it clear that he is not affiliated with her or with the Defendants. <u>No</u> prospective patron of Wilfong's bed and breakfast style lodging would read his reference to Reba McEntire

and think that he is her partner or affiliate.

75. Defendants also overstated the degree to which Wilfong has referenced Reba McEntire, including Defendants' assertion that "his entire promotional campaign for admitted trademark usage of STARSTRUCK FARM is that it was formerly owned and operated by Reba McEntire." In reality, Wilfong's mention of Reba McEntire is more ancillary and parenthetical that anything else. Instead, Wilfong's promotion of his property routinely focuses on the beautiful acreage itself, the foods such as "BBQ" offered, the family activities such as hayrides and bonfires, and the unique and fun lodging units such as "glamping" tents and units that were creatively converted from horse stables. None of these elements have anything to do with the names that are subject to this case. The record shows that Wilfong had no intent to "trade off" on Defendants, or to say or do anything improper or unfair, thus this factor weighs in Wilfong's favor.

### Defendants Have Not Been Damaged By Wilfong's Usage Of His Mark

76. Finally, Defendants are unable to show any harm or damage as a result of Wilfong's Registration or usage of his mark. Despite the fact that Wilfong has owned the farm and widely advertised and used the mark for over three years, Defendants are unable to point to a single instance in which they lost business or were otherwise harmed in any way. This is evident from Defendants' statement of undisputed facts, which alleges merely *possible future* confusion. Such notion is illogical, and is not nearly enough to wrestle Wilfong's Registration from him.

### CONCLUSION

77. In sum, Defendants lacked standing to bring their TTAB claims against Wilfong. Even

if Defendants had standing, there is no likelihood of confusion between the marks at issue due to the differences in the marks themselves and the stark differences in the respective services offered by the parties.

## PROCEDURAL POSTURE

78. The TTAB received briefing by the parties and issued its decision (the "Decision") on November 16, 2022. The Decision sustained the Petition to Cancel.

79. Wilfong, as the losing party in the decision, is dissatisfied with the Decision and hereby appeals the Decision by civil action in this Court under 15 U.S.C. 1071(b)(1) and hereby requests a trial de novo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1. For an Order reversing the Decision;
2. For an Order that Wilfong is entitled to keep the Registration of STARSTRUCK FARM on the Principal Register;
3. For such other and further relief that the issues in this proceeding require.

Dated: January 13, 2023

Jay Wilfong, Pro Se
2890 Academy Road
Lebanon, TN. 37087
615 975 0374
wilfong@comcast.net

## CERTIFICATE OF SERVICE

I certify that a file stamped copy of the foregoing document shall be mailed to or served to the Defendants' Counsel on January 18, 2023.

*Jay R. Wilfong, Pro Se*