UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAY WILFONG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:23-cv-00044 |
| ) | Judge Aleta A. Trauger |
| ) | |
| STARSTRUCK ENTERTAINMENT, LLC, ) | |
| and THE ALEXANDER TRUST, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM

Starstruck Entertainment, LLC ("SEL") and The Alexander Trust ("TAT") have filed a Motion for Summary Judgment (Doc. No. 16), to which Jay Wilfong has filed a Response (Doc. No. 22), and SEL and TAT have filed a Reply (Doc. No. 28). For the reasons set out herein, the motion will be denied.

I. BACKGROUND

TAT is a trust operated for the benefit of Narvel Blackstock, who is, among other things, the ex-husband of the entertainer Reba McEntire. TAT owns SEL, which, according to the defendants, was founded by Blackstock and McEntire "as early as 1991 to manage McEntire's music career and the couple's other business interests." (Doc. No. 23 ¶¶ 1–4.) Blackstock and McEntire are now divorced, and SEL is operated by Blackstock alone, who manages the careers of other country musicians and songwriters. (*Id.* ¶¶ 9, 12.)

TAT holds a federal trademark registration for the use of the word mark STARSTRUCK in connection with the sale of "[p]re-recorded CDs and downloadable digital files featuring music." (Doc. No. 19-13 at 27.) Over the years, TAT and SEL have also used the

STARSTRUCK mark in connection with other music-related services, such as recording and talent management. (Doc. No. 23 ¶ 5.) TAT and SEL have identified a number of instances in which the press have used "Starstruck Entertainment" or just "Starstruck" to refer to the broader business "empire" associated with Blackstock and, before the couple's divorce and the separation of their business dealings, McEntire. (*Id.* ¶ 9.)

While McEntire and Blackstock were married, they (or an apparently affiliated trust) owned a horse farm in Wilson County, Tennessee, named "Starstruck Farms." (*Id.* ¶ 11.) Following the divorce, the land was sold, partially subdivided, and re-sold, and, in March 2019, Wilfong purchased a portion of the land, which he has since used to operate a "combined farm, entertainment venue, and short-term lodging business under the name 'Starstruck Farm.'" (*Id.* ¶ 11–16.) According to Wilfong, he uses that name because it is the name locals use to describe the property and because "Starstruck Farms" was the name on the farm's metal gate when he purchased it. (*Id.* ¶ 22.) However, he has admitted, in testimony, that he knew or expected that the historical connection to McEntire would be a selling point to potential visitors. (Doc. No. 19-21 at 92–93.)

Wilfong applied for—and, on March 24, 2020, received—a federal trademark registration for the word mark STARSTRUCK FARM for use in connection with "[p]roviding facilities for recreation activities." (Doc. No. 23 ¶ 17; Doc. No. 19-2 at 2.) On April 8, 2020, SEL and TAT filed a Petition for Cancellation to the Trademark Trial and Appeal Board ("TTAB"), seeking to have Wilfong's STARSTRUCK FARM registration canceled based on (1) TAT's preexisting rights in the registered STARSTRUCK mark for use with musical recordings and (2) SEL/TAT's common law rights in the use of the STARSTRUCK mark in connection with other music-related ventures, including "booking and scheduling events featuring the services of singers and

songwriters whose music entertainment businesses are managed by Starstruck." (Doc. No. 19-2 at 5; Doc. No. 23 ¶ 23.) On November 16, 2022, following full discovery and briefing by the parties—as well as a denial, on the merits, of a motion for summary judgment by SEL and TAT—the TTAB panel weighed the competing evidence, sustained the petition, and canceled Wilfong's registration. (Doc. No. 19-42 at 62.)

On January 18, 2023, Wilfong filed this case challenging the cancellation of his registration pursuant to 15 U.S.C. § 1071(b), which grants a party aggrieved by a TTAB ruling to obtain review in a federal district court. (Doc. No. 1.) On November 7, 2023, TAT and SEL moved for summary judgment upholding the TTAB's decision. (Doc. No. 16.) TAT and SEL asserted, in the initial briefing for their motion, that Wilfong had "chose[n] to rest on the evidence already submitted to the TTAB," rather than presenting additional evidence to this court, as he has the right to do. (Doc. No. 17 at 2.) In Wilfong's Response, however, he disputes that characterization and indicates that he intends to rely on additional evidence in this court, including testimony by two Starstruck Farm employees, from whom Wilfong has provided Declarations, who would testify to the sophistication of their customers and the lack of confusion experienced by customers of Starstruck Farm. (Doc. Nos. 23–25.) TAT and SEL, for their part, also seek to rely on additional evidence, particularly regarding two alleged instances of actual confusion and circumstantial evidence of Wilfong's "nefarious intent." (Doc. No. 17 at 16.) They argue, however, that Wilfong's new evidence is not relevant to any contested issue before the court. (Doc. No. 28 at 2.)

3

Case 3:23-cv-00044   Document 30   Filed 04/02/24   Page 3 of 16 PageID #: 1973

## II. LEGAL STANDARD

### A. Rule 56

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### B. TTAB Appeals

The Sixth Circuit has characterized a district court's review of a TTAB decision to be "*de novo.*" *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 623 (6th Cir. 2003) (citing 15 U.S.C. §

1071(b)). Some courts, however, have construed that standard as calling for only "limited *de novo* review," which would afford some deference to the TTAB's factual findings, "unless overcome by evidence which 'in character and amount carries thorough conviction.'" *Fleming Companies, Inc. v. Thriftway, Inc.*, 809 F. Supp. 38, 41 (S.D. Ohio 1992) (quoting *Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 306 (9th Cir. 1982)).

TAT and SEL suggest, however, that the Sixth Circuit's approach has likely been superseded by *Kappos v. Hyatt*, 566 U.S. 431, 444 (2012), which involved an equivalent right of district court review of decisions by the Patent Trial and Appeal Board ("PTAB"). (*See* Doc. No. 17.) The Supreme Court held in *Kappos* that, "where new evidence is presented to the district court on a disputed fact question, a *de novo* finding will be necessary to take such evidence into account together with the evidence before the board." *Kappos*, 566 U.S. at 444 (2012) (quoting *Fregeau v. Mossinghoff*, 776 F.2d 1034, 1038 (Fed. Cir. 1985)). That *de novo* review, TAT and SEL concede, would not be "limited" and would involve no automatic deference to the TTAB. (Doc. No. 17 at 6.) At most, "the district court may, in its discretion, 'consider the proceedings before and findings of the [U.S. Patent and Trademark Office] in deciding what weight to afford an applicant's newly-admitted evidence.'" *Id.* at 445 (quoting *Hyatt v. Kappos*, 625 F.3d 1320, 1335 (Fed. Cir. 2010)).

Although the Sixth Circuit has not yet expressly held that *Kappos* applies to TTAB appeals, other courts have done so. *See, e.g., Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 298 (4th Cir. 2021); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188 F. Supp. 3d 22, 37 (D.D.C. 2016), *aff'd*, 743 F. App'x 457 (D.C. Cir. 2018). Moreover, while the Supreme Court has not gone so far as to explicitly state that the holding of *Kappos* governs review of facts in TTAB appeals, it has cited *Kappos* in the trademark context.

5

*See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 144 (2015). Wilfong has not advanced any argument against applying *Kappos* to TTAB proceedings, and, although he does not discuss *Kappos* directly, he has briefed arguments under the *Kappos* standard. The court, therefore, will treat that case as applicable.

The parties, however, disagree regarding the standard that *Kappos* would call for here. Wilfong argues that the TTAB's factual determinations are subject to *de novo* review—the standard ultimately endorsed in *Kappos*. TAT and SEL, however, argue that *Kappos* only calls for *de novo* review if the district court is called on to consider new, relevant evidence that was not presented during the challenged administrative proceedings. TAT and SEL argue that Wilfong has not produced any such evidence, which, they suggest, means that the case should be considered pursuant to a "substantial evidence" standard under the Administrative Procedures Act ("APA"). (Doc. No. 17 at 7.)

### III. ANALYSIS

#### A. Whether Wilfong Has Presented Additional Relevant Evidence

The argument that TAT and SEL present in favor of APA-style "substantial evidence" review depends on the assumption that Wilfong has not presented new, relevant evidence. If that contention is incorrect, then there is no occasion for this court to consider whether TAT and SEL are correct that a "substantial evidence" standard would apply in such a situation. Accordingly, the court will consider, first, whether Wilfong has, as he asserts, identified relevant new evidence.

Wilfong lists three sources for such new evidence: (1) the testimony of three additional witnesses; (2) the defendants' responses to Wilfong's interrogatories; and (3) evidence of alleged actual confusion produced by the defendants. (Doc. No. 22 at 2–3.) SEL and TAT argue that

Wilfong has not shown that the new evidence is relevant to the facts at issue in this case, and that argument is persuasive with regard to some of the items listed. For example, one of the three potential new witnesses is McEntire, whose testimony, Wilfong suggests, is "paramount to the proper adjudication of the claims between the parties." (Doc. No. 22 at 3.) Wilfong, however, has offered little explanation of why he believes McEntire's testimony to be necessary, given that the rights at issue are no longer directly related to McEntire, and he has provided no declaration, affidavit, or other document establishing what any such testimony would be likely to entail. Similarly, Wilfong's interrogatories were met only with objections, not substantive responses, and he does not appear to have taken any steps to overcome those objections, leaving little, if any, actual evidence to consider. (*See* Doc. No. 29-2 at 2–12; Doc. No. 29-4 at 2–12.)

The court, however, cannot assume irrelevance with regard to the testimony of the other two potential witnesses, Starstruck Farm Director of Events Pique Lyle and Operations Manager Patricia Biggerstaff. (*See* Doc. Nos. 24–25.) Those witnesses, unlike McEntire, have signed Declarations that include facts directly relevant to the "likelihood of confusion" analysis that governs this case. Lyle, for example, provides testimony relevant to the issues of actual confusion and customer sophistication, stating that, "[d]uring [her] time residing at Starstruck Farm and working part-time as the Director of Events, [she has] interacted, in-person, with thousands of visitors" and "do[es] not recall one instance of a consumer confusing Starstruck Farm with the business of Starstruck Entertainment, LLC and/or The Alexander Trust." (Doc. No. 24 ¶ 7.) She also states that she has "fielded hundreds of phone calls concerning the business of Starstruck [F]arm" and received a call from a person seeking SEL "on one occasion." (*Id.* ¶ 9.)

Biggerstaff offers testimony on one of the more aggressively contested factual questions in this case: the extent to which Starstruck Farm engages in activities related to the music

7

industry. Specifically, Biggerstaff asserts that "[a]ll music, entertainment, and church services offered at Starstruck Farm are ancillary to the primary bed and breakfast and wedding event business." (Doc. No. 25 ¶¶ 7–9.) One can dispute the persuasiveness of Wilfong's proffered evidence, but it is plainly relevant and was not presented to the TTAB. The court, therefore, will consider Wilfong's appeal *de novo*.

**B. The Defendants' Right to Bring Cancellation Proceedings**

Wilfong argues, first, that the defendants lack "standing" to bring cancellation proceedings against Wilfong's registration. It is not clear, from the summary judgment briefing, whether Wilfong intends to refer to the constitutional doctrine of Article III standing or, instead, one of the cluster of statutory doctrines that have, in the past, sometimes gone under the category of "prudential standing." *See, e.g., In re Capital Contracting Co.*, 924 F.3d 890, 896 (6th Cir. 2019) (explaining that the Supreme Court has "clarified that prior decisions invoking the 'prudential standing' label had really asked a statutory-interpretation question: Does the specific statute give the specific plaintiff a right to bring the specific suit?") (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014)). In any event, neither argument would have any merit.

Wilfong's position that the defendants lacked standing to challenge his registration appears to arise from his assertion that neither SEL nor TAT ever actually owned the Starstruck Farm property, which, he says, was held by another trust. The defendants dispute that characterization but point out that their right to seek cancellation was not based on any past ownership of particular real property, but, rather, on their current rights in connection with the STARSTRUCK mark. The TTAB acknowledged as much and rejected this argument. (Doc. No. 19-42 at 10–11.)

8

The TTAB's analysis was correct in that regard. As a statutory matter, the right to file a cancellation petition is available to "any person who believes that he is or will be damaged . . . , by the registration of a mark on the principal register." 15 U.S.C. § 1064. TAT and SEL, as, respectively, the registrant of the STARSTRUCK mark and an authorized user of that mark, are entitled to rely on that provision. As for constitutional standing, the defendants' claimed competitive injury is sufficient to state a constitutionally cognizable injury, as it typically is in a colorable trademark case based on alleged likelihood of confusion in allegedly overlapping fields. *See Brooklyn Brewery Corp. v. Brooklyn Brew Shop*, 17 F.4th 129, 139 (Fed. Cir. 2021). Wilfong's arguments regarding standing, therefore, provide no basis for denying summary judgment to the defendants.

### C. Likelihood of Confusion

Because TAT and SEL sought cancellation of Wilfong's registration within five years of its issuance, they were entitled to prevail before the TTAB if they established "any ground that would have prevented registration in the first place." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 946 (Fed. Cir. 2000) (citing *Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1091 (Fed. Cir. 1984); McCarthy on Trademarks and Unfair Competition § 20:42 (4th ed. 1996 & Supp. 1999)). Among the grounds for which registration may be refused is that the mark that the applicant seeks to register "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). In other words, registration may be denied or cancelled based on the familiar "likelihood of confusion" analysis common in infringement cases. That is what happened here:

the TTAB concluded that TAT and SEL were entitled to cancellation because they established (1) priority of use and (2) likelihood of confusion with regard to the STARSTRUCK mark. TAT and SEL argue that they are entitled to summary judgment on the merits because the undisputed facts support both conclusions.

With regard to priority of use, that is undoubtedly true. The facts are clear that Wilfong was a latecomer to using the term "Starstruck" in association with goods and services, compared to TAT and SEL. Indeed, all parties agree that he only began using the term after purchasing property that was already associated with the name, due to the activities of either the defendants or former affiliates of the defendants. The parties' ultimate dispute, therefore, involves likelihood of confusion.

In the Sixth Circuit, courts typically "weigh the following factors (sometimes called the *Frisch* factors) to determine whether a likelihood of confusion exists—(1) the strength of the senior mark, (2) the relatedness of the goods or services, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the likely degree of purchaser care, (7) the intent of the defendant in selecting the mark, and (8) the likelihood of expansion of the product lines." *Bliss Collection, LLC v. Latham Companies, LLC*, 82 F.4th 499, 509 (6th Cir. 2023) (discussing factors set out in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)) (other citations omitted). The parties agree that those factors apply, but they disagree regarding which outcome they favor.

**Strength of the STARSTRUCK Mark.** "[T]he strength of a trademark for purposes of the likelihood-of-confusion analysis depends on the interplay between conceptual and commercial strength . . . ." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012). The Supreme Court has endorsed a five-level typology to classify the

10

Case 3:23-cv-00044 Document 30 Filed 04/02/24 Page 10 of 16 PageID #: 1980

relative conceptual strength of a mark from "generic" (the weakest) to "fanciful" (the strongest). *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). As applied to entertainment-related services, STARSTRUCK is best described as a "suggestive" mark, putting it in the middle of that range.[1] *See id.* Conceptually, then, the STARSTRUCK mark is inherently distinctive and relatively strong, but not as strong as marks with less connection to the underlying services.

As for commercial strength, the TTAB concluded that the evidence in the record did not support a finding that the STARSTRUCK mark was either particularly strong or particularly weak. (*See* Doc. No. 19-42 at 27.) This court largely agrees, but it also holds that a reasonable finder of fact could conclude that there is more evidence of commercial weakness than commercial strength. It appears that the STARSTRUCK mark has been used fairly extensively for a number of years, but it also appears that any fame that the Starstruck Entertainment brand has amassed has been secondary to, and significantly overshadowed by, the extensive personal fame of associated individuals, particularly McEntire and other musicians with which SEL has done business. (*See id.* at 26–27.) Indeed, much of the defendants' own evidence suggests that, insofar as the "Starstruck" brand historically accumulated goodwill in the country music industry, it often did so through its now-defunct connection to McEntire as an individual—not from its association with any particular services provided by SEL or TAT. Accordingly, the undisputed facts, read in the light most favorable to Wilfong, do not support a conclusion that this factor favors cancellation.

**Relatedness/Overlap of Goods and Marketing Channels.** "[T]he question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application." *Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP*, 746 F.3d 1317,

---

[1] The TTAB also concluded that the STARSTRUCK mark is suggestive. (Doc. No. 19-42 at 22.)

1323 (Fed. Cir. 2014) (quoting *Octocom Sys., Inc. v. Houston Computer Servs., Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990)). Wilfong applied to register the STARSTRUCK FARM mark only for use with recreation services, which are facially distinct from the specific music-related services listed in the registration of the STARSTRUCK mark. As the TTAB noted, however, there is greater potential for direct overlap between recreation services and the broader set of music-related services in connection with which SEL appears to possess common law rights.[2] (Doc. No. 19-42 at 43.) Wilfong's own evidence confirms that entertainment-related services have been furnished at the farm, albeit only as "ancillary" to its core business, according to him. The relatedness of the goods involved, therefore, supports cancellation, albeit not as strongly as it would if the overlap were more significant.

A similar analysis governs the fifth and eighth *Frisch* factors. The TTAB found some overlap of trade channels and customer bases, and the court agrees that some showing to that effect has been made. (Doc. No. 19-42 at 39.) At the same time, however, this case plausibly falls close to the less troubling end of the spectrum of situations in which some such overlap exists, particularly given that Starstruck Farm is a single, specific physical location and must be marketed accordingly, whereas SEL and TAT face no such geographic limitation. The court therefore finds that this factor weighs in favor of cancellation, but only to a limited degree.

**Similarity of Marks.** As for the third *Frisch* factor, the marks are obviously fairly similar, in that both involve the word "starstruck." However, the governing caselaw is clear that, when a court considers the similarity of two marks, it "must view [the] marks in their entirety and focus on their overall impressions, not individual features." *Bliss Collection*, 82 F.4th at 512 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 283

---

[2] "The . . . rights of a holder of a . . . trademark are always subject to any superior common law rights acquired by another party through actual use prior to the registrant's . . . use." *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001).

(6th Cir. 1997)). The modifier "farm" mitigates some of the marks' similarity—not merely because it is an additional word, but because "farm" is a term with no direct, inherent relationship to celebrity, fame, or the entertainment industry. A farm, or a place that calls itself a farm, may, of course, be a venue for musical performance, but the same would be true of any number of types of locations.

Nevertheless, "the presence of an additional term in [one] mark does not necessarily eliminate the likelihood of confusion if some terms are identical" between that mark and another. *In re Mighty Leaf Tea*, 601 F.3d 1342, 1347–48 (Fed. Cir. 2010) (collecting cases). That principle holds in this instance; the additional word in STARSTRUCK FARM does not inherently negate the potential for confusion. Nor does the contextual connotation of STARSTRUCK FARM negate that potential, given that "Starstruck Farm" is, the parties agree, a literal and nearly verbatim reference to a specific location that is, as a matter of historical fact, associated with a famous musician. Accordingly, the showing by TAT and SEL in connection with this factor is sufficient to be consistent with cancellation—but not overwhelmingly so.

**Actual Confusion/Purchaser Care.** The issues of actual confusion and purchaser care can be related, because actual customers' confusion, or lack thereof, is circumstantial evidence of the amount of care they exercised in making their choices. The TTAB found the question of customer care to be neutral and gave relatively little weight to the apparent lack of actual confusion, on the ground that Starstruck Farm had not been open long. (Doc. No. 19-42 at 41, 43–44.) Now, however, Wilfong has introduced evidence—which the court must credit for the purposes of Rule 56—suggesting more persuasively that Starstruck Farm's customers and potential customers were sophisticated and careful enough to understand that the fact that the farm used to belong to McEntire and continues to bear the "Starstruck" name does not mean that

13

it is currently being operated by SEL or TAT.

SEL and TAT have introduced new evidence of their own that, they argue, shows that actual confusion has occurred. (*See* Doc. Nos. 19-44, -45.) As Wilfong points out, however, the first cited instance of actual confusion does not appear to have taken the form of a consumer's confusing Starstruck Farm and SEL, but, rather, the consumer's mistakenly believing that the entities, together, continue to be affiliated with McEntire as an individual. (*See* Doc. No. 19-44.) It is difficult to see how that confusion could be interpreted as Starstruck Farm's trading on *SEL's* goodwill, because the relevant goodwill—McEntire's—belongs to neither. The second supposed instance of actual confusion does not depict confusion at all—it is a message from someone asking *if* Starstruck Farm was associated with SEL. The message, moreover, is not from an ordinary customer, but rather a preexisting associate of an SEL employee. (*See* Doc. No. 19 ¶ 48; Doc. No. 19-45.) Viewing the evidence in the light most favorable to Wilfong, then, these factors do not support cancellation.

**Wilfong's Intent.** This case presents a somewhat unusual situation when it comes to intent, for two reasons. The first is that it is undisputed that Wilfong's use of the "Starstruck" name arose, as a matter of historical fact, from the prior use of that term by individuals associated with SEL and TAT, but that prior use was not the same type of use that actually undergirds the protections afforded to the STARSTRUCK mark under either the Lanham Act or the common law. Rather, Wilfong calls his property "Starstruck Farm" because McEntire and Blackstock gave the property that name, as a horse farm, before selling it. SEL and TAT, however, do not assert any rights to goodwill associated with the horse farm, but, rather, other business ventures using the "Starstruck" name.

The origin of the farm's name, in turn, highlights the second reason why this case is

14

unusual: the fact that some of the relevant goodwill associated with the "Starstruck" name is not actually goodwill for SEL or TAT, but goodwill for McEntire, who is no longer affiliated with those entities. SEL and TAT point to testimony, by Wilfong, that he hoped to profit off of the location's historical connection to McEntire, which SEL and TAT suggest shows bad faith. (*See* Doc. No. 17 at 16.) The historical connection to McEntire, however, is simply a true fact about the relevant property. SEL and TAT, moreover, have no right to seek to vindicate any interest in the goodwill held by consumers toward McEntire as an individual, because they are simply business entities with no current affiliation with her. Based on the lack of evidence that Wilfong ever intended to trade on the reputation of SEL and TAT, the TTAB found this factor neutral. This court would go a step further—the fact that Wilfong wishes to evoke a (true) historical connection to McEntire, rather than a (false) current connection to SEL or TAT, weighs against cancellation.

The additional evidence of alleged ill intent offered by TAT and SEL does not refute that conclusion. TAT and SEL do not identify any additional evidence of bad faith surrounding the "Starstruck" brand or McEntire herself, but, rather, rely on the fact that Wilfong has used the name "Grand Ole Barn" in connection with a songwriters' event on the property, which, according to TAT and SEL, shows "an attempt to trade on the reputation of the Grand Ole Opry." (Doc. No. 17 at 17.) As TAT and SEL acknowledge, however, the Grand Ole Opry is a distinct entity that is not operated by SEL or TAT, and the rights to the GRAND OLE OPRY mark do not belong to TAT or SEL. Moreover, Wilfong's apparent allusion to the Grand Ole Opry could be read to suggest that Starstruck Farm's marketing to songwriters involves a broader homage to the country music industry as a whole—not an attempt to trade on the specific goodwill of SEL, TAT, or McEntire. Because these issues are presented under Rule 56, the court

must favor the interpretation more favorable to Wilfong.

**Balancing of Factors.** As the court has already noted, TAT and SEL have identified some evidence that is supportive of cancellation. Indeed, they have almost certainly identified evidence that would permit a reasonable finder of fact to conclude that cancellation was appropriately awarded. What matters under Rule 56, however, is not whether a reasonable finder of fact *could* side with the movant, but whether that reasonable finder of fact *could only* side with the movant. Although the TTAB ultimately cancelled the mark, it did not find the evidence to be that lopsided and denied summary judgment when TAT and SEL sought it in those proceedings. (*See* Doc. No. 19-19 at 11.) Similarly, this court finds that contested issues of fact—particularly regarding the commercial strength of the STARSTRUCK mark, the amount of overlap in the relevant services, and the sophistication and care of the relevant customers—leave room for reasonable disagreement regarding whether cancellation would be appropriate. TAT and SEL, as the parties seeking cancellation, bear the burden of supporting that course of action. While they have shown that some of the *Frisch* factors are capable of supporting cancellation to some degree, the strength of that showing depends on inferences and assumptions that the court cannot adopt in connection with a motion for summary judgment. The court, accordingly, cannot grant the motion.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 16) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge