**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JAY WILFONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00044** |
| | ) | **Judge Aleta A. Trauger** |
| **STARSTRUCK ENTERTAINMENT AND THE ALEXANDER TRUST,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Before the court is the Motion for an Award of Attorneys' Fees ("fee motion") (Doc. No. 81) under the Lanham Act, filed by defendants Starstruck Entertainment and the Alexander Trust. For the reasons set forth herein, the motion will be granted in part, but the court will award attorney's fees in an amount substantially less than that sought by the defendants.

## I. ATTORNEY'S FEES UNDER THE LANHAM ACT

Federal Rule of Civil Procedure 54(d) governs the timing and procedure for seeking attorney fees in cases where such fees are permitted by a federal statute. The federal statute at issue here is the Lanham Act, which provides, succinctly, that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party" in a trademark violation case. 15 U.S.C. § 1117(a).

The Supreme Court and the Sixth Circuit have clarified how the term "exceptional" is to be construed. An "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness,*

*LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (construing an identical attorney's fee provision in the Patent Act, 35 U.S.C. § 285). The Sixth Circuit has confirmed that this definition of "exceptional" also applies to attorney's fee awards under the Lanham Act. *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 235 (6th Cir. 2019); *see also La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607, 614–15 (6th Cir. 2023); *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 478 (6th Cir. 2022), *reh'g denied*, No. 20-3598, 2022 WL 3237492 (6th Cir. Aug. 10, 2022); *Slep-Tone Ent. Corp. v. Karaoke Kandy Store, Inc.*, 782 F.3d 313, 318 (6th Cir. 2015).

*Octane Fitness* suggests a number of factors district courts are to consider in determining whether to award fees. *Octane*, 572 U.S. at 554. As the Sixth Circuit has explained:

> The plaintiff might have an unusually strong (or unusually weak) case on the merits. Blatant trademark infringement might justify an award for the plaintiff, whereas a frivolous infringement claim might justify one for the defendant. Or the losing party might have litigated the case in an unreasonable manner—for example, by requesting costly discovery to coerce a settlement despite the weakness of its claims.

*Max Rack*, 40 F.4th at 478 (internal citations omitted). "In the end," a district court has discretion under the Act "to decide under the totality of the circumstances whether the case before it has the 'rare' qualities that distinguish it from a typical case." *Id.*

## II. BACKGROUND

Plaintiff Jay Wilfong purchased the farm known as Starstruck Farm in 2019. He registered the mark STARSTRUCK FARM with the U.S. Patent & Trademark Office in March 2020 for use in connection with "[p]roviding facilities for recreation activities." (Doc. No. 30 at 2 (citing Doc. No. 23 ¶ 17; Doc. No. 19-2 at 2).) The defendants own the federal trademark registration for the use of the word mark STARSTRUCK in connection with the sale of "[p]re-recorded CDs and downloadable digital files featuring music" and have also used it in connection with other music-

related services, such as recording and talent management. (*Id.* at 1–2; *see also* Doc. No. 19-13 at 27.) In April 2020, the defendants filed a Petition for Cancellation to the Trademark Trial and Appeal Board ("TTAB"), seeking to have Wilfong's STARSTRUCK FARM registration cancelled. In November 2022, following full discovery and briefing by the parties and the denial of a motion for summary judgment by the defendants, the TTAB cancelled Wilfong's registration.

Wilfong filed this case in January 2023, challenging the cancellation of his registration under 15 U.S.C. § 1071(b), which grants a party aggrieved by a TTAB ruling to obtain review in a federal district court. (Doc. No. 1.) This court, upon consideration of new evidence presented by Wilfong and applying a *de novo* review standard, denied the defendants' Motion for Summary Judgment in April 2024. (*See* Doc. Nos. 30, 31.) The court specifically found that, although the defendants had identified sufficient evidence to permit a reasonable fact finder to conclude that cancellation was appropriately awarded, contested issues of fact as to the "commercial strength of the STARSTRUCK mark, the amount of overlap in the relevant services, and the sophistication and care of the relevant customers" precluded summary judgment on the "likelihood of confusion" issue governing this case. (Doc. No. 30 at 16.) The matter was thereafter set for a bench trial later in 2024. Due to a scheduling conflict, the court continued the trial date to April 2025 and, meanwhile, ordered the parties to mediate. (*See* Doc. Nos. 35, 36, 39.) The parties mediated unsuccessfully in November 2024. (*See* Doc. No. 38.)

After several resettings attributable to both the court and the parties, the court conducted a bench trial in this matter on January 15, 2026. The parties presented opening statements, and the plaintiff presented his case: both Wilfong and Mark Skota, General Manager of Starstruck Farm testified. (*See* Tr., Doc. No. 80.) Wilfong first testified that he owns the stone entry gates to Starstruck Farm (*see id.* at 25–26), even though the parties had entered into a pretrial stipulation

of the fact that, prior to Wilfong's purchase of the property, the defendants had conveyed a strip of the land along the eastern side of State Route 109 to the State of Tennessee as part of a proposed expansion of the highway, and this strip of land "includes stone gates which still bear the logo and name of Starstruck Farms" (Doc. No. 67 ¶ 13). In other words, Wilfong does not own the stone entry gates.

In addition, Wilfong testified that he has "tried consistently and diligently" to also use "Farm" when he uses the term "Starstruck" and trains his staff to use the full name and that, although he provides music at the Farm, he has no intention of operating as a recording studio or providing artist management services (Doc. No. 80 at 32, 37–38.) In his opinion, there was no risk that the public would confuse his facility, which primarily provides lodging, with the defendants, who engage in talent management and the promotion, advertising, branding, and guidance for established and new artists. (*See id.* at 40.) On cross-examination, he testified that, to the best of his knowledge, his company's social media marketing posts always used the full name, "Starstruck Farm." (*Id.* at 56.) He emphasized that he did not "want any confusion. And there hasn't been any confusion." (*Id.*) He was thereafter confronted with the evidence of at least 61 separate instances in recent social media posts where, in fact, the name "Starstruck" alone—not Starstruck Farm—was used. (*See id.* at 57–64.)

Wilfong was also confronted on cross-examination with additional evidence substantially contributing to the likelihood of confusion arising from his use of STARSTRUCK FARMS as a mark, most notably the offering of artist-development and country-music-related events at his facility, including songwriter nights held at the "Grand Ole Barn" on the property and "Rising Star Sessions" directed toward "discovery" of new talent, which offered winners a "sponsorship and artist development packet, including professional promotion, advertising, branding and guidance

and networking with Nashville's best musicians, singers and industry connections." (*Id.* at 68–72.)

At the close of Wilfong's cross-examination, the court observed that it "looks . . . like a little gotcha is going on here for defense counsel to say, oh, we just discovered all this stuff after we had to disclose exhibits." (*Id.* at 78.) Defense counsel explained that, although they had become aware of the social media posts used to impeach Wilfong prior to the January 5, 2026 deadline for disclosing exhibits, they had not discovered them early enough to supplement their discovery, so they believed it would not have been appropriate to include them on their exhibit list. (*Id.* at 93.) The court noted that they could have "filed a motion for permission with an explanation," which would also have meant providing the documents to plaintiff's counsel. (*Id.*) Counsel acknowledged that they could have done so but denied any "attempt to engage in sharp practices or trap anybody" and stated that they were "frankly kind of surprised to hear Mr. Wilfong testify on direct that he never . . . used Starstruck by itself." (*Id.* at 93–94.) Defense counsel also acknowledged that, if Wilfong had testified that his social media marketing posts sometimes used the name Starstruck by itself, the defendants would have had no basis for introduction of the social media posts to impeach that testimony. (*Id.*) Counsel acknowledged that they "may have screwed up" by not becoming aware of the social media posts sooner and by not bringing them to plaintiff's counsel's attention. (*Id.* at 96.)

After the court signaled to the plaintiff that his case was "looking very bleak," in light of his cross-examination, the plaintiff moved under Rule 41(a)(2) to dismiss his case with prejudice, stating on the record that "those posts were a surprise" to both Wilfong and his attorney and that, if they had known about them before trial, Wilfong might have "approached the case differently." (*Id.* at 97, 98.) The defendants did not oppose dismissal, but they made it clear that they wanted to reserve the right to move for attorney's fees under the Lanham Act. (*Id.* at 102.)

## III. DISCUSSION

### A. Whether to Award Fees

The defendants thereafter filed their fee motion, asking the court to "declar[e] this case exceptional" and to award them fees of over $500,000. They argue that the case is "exceptional" because Wilfong pursued this case through a TTAB trial to a trial in this court, where he advanced a position that was "not only substantively weak but was advanced through testimony that was directly contradicted by his own marketing materials and social media." (Doc. No. 81 at 1.) The defendants contend that Wilfong's entire case depended on the purported absence of a likelihood of confusion between the STARSTRUCK FARM mark and the STARSTRUCK mark and that, to support that position, Wilfong testified falsely at trial that he had "no interest in managing musicians and that he carefully curated his social media to avoid infringing uses of the STARSTRUCK mark to market Starstruck Farm." (*Id.*) However, confronted on cross-examination with "incontrovertible evidence of his business offering 'artist development' and 'sponsorship' packages for musicians, and dozens of infringing social media posts," Wilfong "immediately abandoned his case and moved for voluntary dismissal." (*Id.* at 1–2.)

According to the defendants, the plaintiff's "forcing Defendants to fully litigate a meritless appeal for years, only to immediately fold when confronted with dispositive, contradictory evidence from his own marketing and social media posts at trial," makes this case "exceptional." (*Id.*) With reference to the *Octane* standard, the defendants argue that this case is exceptional both because it was substantively weak from the outset and because of the unreasonable manner in which Wilfong litigated it, "culminating in false and misleading trial testimony." (*Id.* at 5.) The defendants emphasize the latter argument and characterize Wilfong's testimony as a "calculated effort to mislead the Court about the nature and scope of his business, especially as it relates to direct competition with services Defendants offer under the STARSTRUCK mark." (*Id.* at 6.)

The plaintiff argues in response that this case falls "far short of the Lanham Act's 'exceptional case' standard," as his case was "reasonable and rooted in the TTAB record until confronted with documents at trial" that had not previously been produced or admitted into evidence. (Doc. No. 85 at 2.) Relying on the now-superseded "malicious, fraudulent, willful, or deliberate" standard articulated in *Eagles, Ltd. v. American Eagle Foundation*, 356 F.3d 724 (6th Cir. 2004), Wilfong points out that both the TTAB and this court found no evidence of bad faith on Wilfong's part. (*See id.* at 3 (citing *Starstruck Entm't, LLC v. Wilfong*, Cancellation No. 92073879, slip op. at 54 (T.T.A.B. Nov. 16, 2022); Doc. No. 30 at 5)).) He also notes that "nearly half" (in fact, more than half) of the fees the defendants seek accrued after the denial of the defendants' Motion for Summary Judgment, and he argues that the defendants essentially seek to punish him for continuing to challenge the cancellation of his mark after the court ruled in his favor on summary judgment. (*Id.* at 4.)

Considering the totality of the circumstances as required by *Octane Fitness*, the court finds that, at least through summary judgment, this case was not remotely exceptional. The defendants did not prevail at the summary judgment stage in the TTAB proceeding or in this court, and, although they ultimately prevailed in both fora, their position was not unusually strong on the merits. Moreover, neither the plaintiff's decision to continue to contest the cancellation of the STARSTRUCK FARMS mark after losing at TTAB nor his decision to continue to pursue his case in this court after the denial of the defendants' summary judgment motion renders this case unusual or exceptional.

The defendants' position based on the likelihood of confusion caused by the plaintiff's use of the STARSTRUCK FARMS mark did not become markedly stronger until the plaintiff's business began, at some point, to use the term "Starstruck," standing alone, rather than "Starstruck

Farms," much more frequently in its social media marketing posts and, further, as the defendants describe it, began "actively building a competing musical entertainment and artist development business under a confusingly similar mark." (Doc. No. 81 at 5.)

This social media material demonstrating these events apparently was not produced by the plaintiff in discovery but was nonetheless discovered by defense counsel shortly before the bench trial—so shortly before trial that defense counsel held onto it, apparently with the hope, if not the expectation, that Wilfong would offer false and misleading testimony at trial that expressly contradicted what the social media posts showed and thus would permit the defendants to introduce as impeachment evidence the documents that were ultimately introduced as its Exhibits 6 and 7 at trial. This tactic was successful, resulting in Wilfong's complete capitulation shortly after his testimony concluded. This capitulation was extraordinary—indeed, exceptional—in the court's experience. It is exceedingly rare for a party to be so thoroughly impeached with that party's own social media posts at trial that the party immediately moves for dismissal of his case *with prejudice* following the party's testimony.

While these events make this case exceptional, the court finds that they do not retroactively entitle the defendants to attorney's fees going back to the inception of the case. Notably, as best the court can ascertain from the defendants' trial exhibits, the social media posts using the term (and hashtag) "Starstruck" by itself, associated with events relating to country music—and, perhaps most egregiously, with "songwriter sessions" and "Rising Star Sessions"—date from after the entry of the court's Order and Memorandum denying the defendants' Motion for Summary Judgment, in April 2024. In other words, rather than monitoring the conduct of his business to ensure there was no confusion between the marks while this case was proceeding toward trial, the

plaintiff turned the other way, apparently willfully engaging in competing conduct that markedly increased the likelihood of confusion.[1]

In sum, this case *became* exceptional when the plaintiff began engaging in progressively more egregious conduct after the denial of the defendants' Motion for Summary Judgment, culminating in Wilfong's testimony regarding the absence of confusion that was flatly contradicted by his own company's social media marketing posts. The court finds that the defendants are entitled to fees under 15 U.S.C. § 1117(a) and the *Octane* standard, but it will not award fees for any work performed prior to the denial of summary judgment in April 2024.

Having concluded that some award of fees is appropriate, the court must determine the amount of those fees.

**B. Calculation of a Reasonable Fee**

*1. The Lodestar Calculation*

A court called upon to award a reasonable fee must first calculate the "lodestar" amount, *Rembert v. A Plus Home Health Care Agency LLC*, 986 F.3d 613, 616 (6th Cir. 2021), by "identify[ing] a reasonable hourly rate and determin[ing] the hours reasonably expended on the litigation" to reach a "reasonably objective 'initial estimate of the value of the lawyer's services,'" *U. Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 503 (6th Cir. 1984) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). Once the lodestar amount is calculated, the court must then "measure that amount against several factors," including the results obtained by the litigant. *Id.*

[1] Even if the plaintiff was not paying close attention to the social media posts, he could not have been unaware of the musical events offered at his facility.

The factors the district court may consider, "either in determining the basic lodestar fee and/or adjustments thereto," include the following:

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 n.8 (6th Cir. 2000) (quoting *Reed v. Rhodes*, 179 F.3d 453, 472 n.3 (6th Cir. 1999). In the majority of cases, the lodestar calculation of the reasonable number of hours expended in a case will already reflect consideration of these factors. *See Gonter v. Hunt Valve Co.*, 510 F.3d 610, 621 (6th Cir. 2007) (considering request for enhancement of the lodestar amount).

In reviewing a request for fees, the court must "provide a concise but clear explanation of its reasons for the award. The district court should state with some particularity which of the claimed hours the court is rejecting, which it is accepting, and why." *Smith v. Serv. Master Corp.*, 592 F. App'x 363, 366 (6th Cir. 2014) (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir. 1997)).

*2. Application to this Case*

The defendants employed lawyers from three different law firms over the course of this dispute: Bradley Arant Bould Cummings LLP ("Bradley"), Loeb & Loeb LLP ("Loeb & Loeb"), and Waddey Acheson LLC ("Waddey"). And, as lead counsel for Waddey explains, the case had distinct phases: (1) the pre-trial phase of the TTAB proceeding; (2) the trial phase of the TTAB proceeding; (3) the pleadings phase of the district court proceeding; (4) the summary judgment phase in this court; and (5) the pretrial/trial phase in this court. Bradley was the defendants' counsel

through the TTAB proceedings. Although Bradley attorney Jacob Neu entered an appearance after this lawsuit was filed and did not formally withdraw from this case until June 2025, his involvement was apparently minimal, and the vast majority of the work performed up through the conclusion of the summary judgment phase was performed by the Loeb & Loeb attorneys. Following the denial of summary judgment, the defendants retained Waddey to assist with trial preparation. Although Loeb & Loeb attorneys Tim Warnock and Keane Barger did not formally withdraw until June 2025, it is apparent from the docket and the billing invoices that the Waddey attorneys did the heavy lifting in terms of trial preparation.

Regarding this distribution of work, efficient though it may have been to engage three different law firms with different specialties, the court finds that the plaintiff should not be burdened by the potentially duplicative costs associated with hiring multiple firms whose work, at times, overlapped. Accordingly, the court will not award any fees at all for the work performed by Bradley, which overlapped with the work performed by Loeb & Loeb, will not award any fees for work performed by Loeb & Loeb after the Waddey attorneys entered an appearance, and will not award fees to the Waddey attorneys for work performed *before* they entered an appearance.

This leaves for consideration Loeb & Loeb's invoices from May 2024 (following entry of summary judgment) through May 2025 (totaling $48,852.50)[2] and Waddey's invoices from June 2025 through January 2026 (totaling $232,935.85).[3]

---

[2] The court has excluded from this figure costs other than attorney's fees reflected on the Loeb & Loeb invoices.

[3] In response to the plaintiff's objection to some invoice entries as "duplicative" of work incurred in a parallel state litigation, defense counsel agreed to "carve out" any amounts to which the plaintiff objected, without conceding that these amounts are improperly duplicative. (*See* Doc. Nos. 85, 86, 87, 87-1.) Only one of these carve-outs remains relevant in light of the court's decision to exclude from consideration a large portion of defense counsel's invoices. Specifically, Waddey agreed to "carve out" $82.50 from a June 12, 2025 entry by timekeeper "MP" (Max Pinson) on its invoice number 163 that references 0.2 hours spent reviewing the Wilson County complaint. (*See*

The plaintiff objects to any fees that are or appear to be duplicative of fees incurred in parallel litigation in the Wilson County Chancery Court.[4] This issue, however, has been resolved by the court's limitation of the timeframe for which fees will be permitted. *See* Note 4, *supra*.

The plaintiff also objects to the defendants' "mention[ing] the length of this dispute as a reason to punish Mr. Wilfong for an award of fees without mentioning how the Defendants unilaterally delayed the resolution of this litigation by filing three separate motions to reset the trial date," which collectively resulted in a "nearly two (2) year delay from the original date." (Doc. No. 85 at 8 (citing Doc. Nos. 32, 40, 54).) The court observes that at least some of the delays were caused by the court's scheduling issues. However, the court will deduct 2.5 hours from Loeb & Loeb's time for time spent seeking continuances, or $1,537.50 (2.5 x $615) (*see* Doc. Nos. 82-2 at 114, 79) and 1.5 hours from Waddey's invoices, or $750 (1.5 x $500) (*see id.* at 11).

The plaintiff also asserts that an award of attorney's fees in this case would be premature, since the Wilson County Chancery Court case, in which Wilfong "maintains an active compulsory counterclaim in the form of a Declaratory Judgment Claim for Non-Infringement," has not yet been resolved and there has been no finding of infringement by Wilfong. (Doc. No. 85 at 9.) The court finds the status of the Wilson County infringement case to be irrelevant. This case involves Wilfong's challenge to the cancellation of his trademark, and the defendants have prevailed on

Doc. No. 87-1 at 6; Doc. No. 82-2 at 28.) The original entry, however, was only in the amount of $62.50, not $82.50, and it had already been written off from the total bill. (*See* Doc. No. 82-2 at 28, 29.) The court, therefore, has not deducted this additional $82.50 from the total billing amount for the relevant time frame.

[4] The plaintiff attached the Wilson County Complaint to his Response to the fee motion. (Doc. No. 85-1.) In that case, Starstruck Entertainment, LLC sued Wilfong and a related entity for common law trademark infringement and unfair competition and violation of the Tennessee Consumer Protection Act. (*Id.*)

that issue. The question of Wilfong's infringement of the defendants' trademark or trade name is a wholly different matter.

Otherwise, Wilfong does not object to the hourly rates sought by defense counsel; nor does he contend that the amount of time spent on particular tasks is excessive. Defense counsel has submitted the Declarations of Chanelle Acheson, lead attorney for the team of Waddey lawyers, and Tim Warnock, lead attorney for the Loeb & Loeb firm, in which they both attest that the sums requested by their respective firms are "the product of reasonable hours expended multiplied by the reasonable hourly rates of the professionals involved, with discounted rates and written-off time applied as ordinarily employed in the use of the firms' commercial judgment." (Doc. No. 82, Acheson Decl. ¶ 6; *see also* Doc. No. 83, Warnock Decl. ¶¶ 3, 5.) Both firms submitted detailed billing records, documenting the tasks performed, the time spent, the identity of the professional performing the task, and the hourly rate of each professional. Both Acheson and Warnock attest that the rates charged by the professionals who worked on the case are "reasonable and consistent with the rates charged for similar work by attorneys with comparable skill and reputation in the Nashville legal market." (Warnock Decl. ¶ 5; *see also* Acheson Decl. ¶ 18.) Attorney "bios" are also attached as an exhibit to the fee motion, detailing the expertise and years of practice of each billing professional, and their experience and background are also summarized in counsel's declarations. (Doc. No. 82-3; *see also* Acheson Decl. ¶¶ 21–24; Warnock Decl. ¶ 6.) Finally, Acheson avers at length in her Declaration that (1) this case was not "straightforward," and the "hours expended were a direct and necessary response to Plaintiff's litigation choices"; (2) the litigation raised novel and difficult challenges; (3) the defendants' ultimate success was the "direct result of the high-quality, specialized legal work performed by experienced intellectual property litigators"; (4) the case consumed "a significant portion of counsel's resources" at the firms

involved, precluding other employment;[5] (5) this was a "high-stakes" case for the defendants, and the result achieved was a "total victory"; (6) the defendants were represented by "highly experienced and reputable intellectual property counsel from three distinguished firms"; (7) the case was "undesirable," given its "protracted and contentious nature," and "presented a substantial financial burden and resource drain that required a significant, long-term commitment from both Defendants and their counsel"; (8) the defendants' decision to employ three different firms at different stages of the litigation was intended to "ensure[] that the most qualified and efficient professionals were deployed for each critical stage of the defense"; and (9) the fees requested are in line with awards in other complex trademark cases where prevailing parties have been awarded fees. (Acheson Decl. ¶¶ 14–17, 19–20, 27–29.)

The court, being familiar with the trajectory of this case and many of the lawyers involved and having reviewed the materials filed in support of the defendants' motion, finds that the hourly rates of the billing attorneys ranging from $700 at the high end to $250 at the low end are reasonable and within an acceptable range for each practitioner's level of experience in the specialized intellectual property field within this district. However, the court will reduce the billing rate for one senior Waddey attorney from $875 to $700 per hour, which results in a deduction of $752.50 (4.3 hours x $175 difference).[6] The paralegal rate of $125–200 per hour is reasonable, but the court finds that the hourly rate of $250 for one senior paralegal is excessive. That rate will be reduced to $200 per hour, which results in a deduction of $2,465 (49.3 hours x $50 difference).

In consideration of all of the relevant factors, as set forth above and addressed in the Acheson Declaration, the court finds that the fees to be awarded represent a reasonable hourly rate

---

[5] This particular assertion rings hollow to the court.

[6] On some occasions, the billing rate for attorney Bob Walker is reflected as $700 on Waddey's invoices. (*See* Doc. No. 82-2 at 26, 13.)

multiplied by hours reasonably spent by each practitioner in the defense of this lawsuit. Accordingly, the court will award a fee totaling $276,283.35, which represents $47,315 of the total $48,852.50 billed by Loeb & Loeb from May 2024 through May 2025, plus $228,968.35 of the total $232,935.85 billed by Waddey June 2025 through January 2026.

## IV. CONCLUSION

As set forth herein, the defendants' Motion for an Award of Attorneys' Fees (Doc. No. 81) will be granted in part. The court will enter a fee award in the total amount of $276,283.35. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge